**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| Calderia, LLC, Vanderburgh Foundation Ash Street Realty Trust through its trustee Michelle Ngila, Caezer Damante, and Newlife, LLC,<br>　　Plaintiffs, | )<br>)<br>)<br>)<br>) | |
| v. | )<br>) | C.A. No. 25-13997 |
| City of New Bedford, Daniel Romanowicz a/k/a Danny Romanowicz, and Matthew Silva,<br>　　Defendants. | )<br>)<br>) | |

**COMPLAINT AND JURY DEMAND**

**Parties**

1.  Plaintiff, Calderia, LLC, is a domestic limited liability company with an address of 14 Main Street, Wales, MA, 01081.  Calderia, LLC owned 52 Ash Street, New Beford, MA from July 21, 2023 through January 9, 2025.

2. Plaintiff, Vanderburgh Foundation Ash Street Realty Trust, through its trustee Michelle Ngila, has an address of 1 N. Main Street, Webster, MA 01570.  Vanderburgh Foundation Ash Street Realty Trust has owned 52 Ash Street, New Bedford from January 9, 2025 to the present.

3.  Plaintiff, Caezer Damante, is an individual with an address of 125 Warren Street, Fall River, MA 02721.  Caezer Damante has owned 7 Plymouth Street, New Bedford, MA from April 11, 2024 to the present.

4.  Plaintiff, Newlife, LLC, is a domestic limited liability company with an address of 20 Prouty Road, Burlington, MA  01803.  Newlife, LLC owned 103 Caroline Street, from

1

January 31, 2024 through October 23, 2025.  Newlife, LLC has owned 479 County Street from March 29, 2024 to the present.

5.  Defendant, City of New Bedford, is a municipality with an address of 133 Williams Street, New Bedford, MA 02740.

6.  Defendant, Daniel Romanowicz a/k/a Danny Romanowicz, is the Commissioner of the City of New Bedford's inspectional services department and has a work address of 133 Williams Street, New Bedford, MA 02740.

7.  Defendant, Matthew Silva, is a Building Inspector with the City of New Bedford's inspectional services department and has a work address of 133 Williams Street, New Bedford, MA 02740.

**Background**

8. During September 2023, after purchasing 52 Ash Street, Calderia, LLC's representative, Hunter Foote, was interviewed by *The New Bedford Light* concerning the intended use of the property as a sober house.[1]  The September 18, 2023 *New Bedford Light* article makes it clear that neighbors and political figures, who resided in the neighborhood, were steadfastly opposed to the property being used as a sober home.  The article states, "The neighbors say a sober house — a form of group living for people recovering from substance abuse — does not belong in their historic single-family home neighborhood, which happens also to be home to Mayor Jon Mitchell, State Rep. Antonio Cabral, State Sen. Mark Montigny and former Mayor Scott Lang."[2]

---

[1] https://newbedfordlight.org/neighbors-oppose-sober-home-but-owner-isnt-revealing-his-plans/
[2] The documents referenced herein are incorporated in full into this Complaint and Jury Demand.

9. During September 2023, neighbors and community representatives made it clear to Calderia, LLC that they were strongly opposed to a sober home opening at 52 Ash Street. The neighbors and community representative called upon the City of New Bedford to stop 52 Ash Street from opening as a sober house.[3]

10.  Upon information and belief, the City of New Bedford, at the direction of its Mayor and through its Department heads, thereafter, targeted all sober homes within the City and used aggressive code enforcement against 52 Ash Street and numerous other sober homes to interfere with and prevent their opening and/or use as sober homes.  The City targeted numerous sober homes to make its actions seem "normal" or "uniformly applied," as opposed to targeting 52 Ash Street alone because of its proximity to the Mayor's home.

11.  The Defendants have used State Law and enforcement procedures derived therefrom to put extreme pressure on sober homes, in an effort to stop their operations within the City.  The City of New Bedford has simply overburdened sober homes with compliance issues, that are impossible to achieve (due to cost, red tape and/or interpretation) or too vague or complicated to understand.

12.  During a hearing in the Southeast Housing Court in relation to the City of New Bedford's attempt to obtain a TRO to prevent the continued occupancy of 52 Ash Street, Building Inspector Matthew Silva testified, in part, as follows:

---

[3] For purposes of this Complaint and Jury Demand, "sober house," "sober home," "sober recovery home," and "congregate housing for the disabled," or variations thereof are the same, in that it is housing for individuals in recovery from substance use who are not active users and qualify as disabled/handicap under State and Federal Law.

Q Well, isn't it fair to say that if you issued violations of the type of nitpicking that's in this complaint for every building in the city, there'd be a line out the door?

A What do you consider nitpicking?

Q A crack on a screen door. That's nitpicking. right?

A No, that's a broken door. It's a door that wasn't working at the time, that if you were to utilize, I wasn't sure it would break. Now, there's no law saying that you needed to --

Q Is that an issue that the City typically takes people to court for?

A We're not here just for a storm door.

Q Because you're here today because people complained about it being a sober house, which started the whole thing, correct?

A We're here today because the rest of the violations that are pertinent to it at the time, which was a sprinkler system, the Architectural Access Board, the bulge in the rear wall, and the fire escape not being corrected. Were there other smaller violations, did I tell them he needed to get fixed, that he should address; yes. Did I tell him he needed a permit to address those things, no, because it was mostly repair. It was just a comprehensive list of things that should be taken care of. The reason I brought up the storm door, because it's on a main means of egress of that area which affected that means of egress.

**Q But you were out there in the first place to make this comprehensive list because there were complaints about the property being used as a sober house, right?**

**A That's correct. (Emphasis Added).**

13.  Matthew Silva first went out to 52 Ash Street to inspect it during September 2023, solely because of neighborhood complaints about the existence of a sober home.

14.  At a June 12, 2024 community meeting for Ward 5, over 100 individuals showed up and expressed a unanimous demand that City officials do *something* to clamp down on unregulated sober houses.[4]  The *New Bedford Light* reported on June 19, 2024 that, "This month, the city sent letters to more than a dozen sober houses telling them they need a lodging house license, which could require costly building upgrades. And the city has taken court action against two sober houses to investigate them for code violations." That article

---

[4] https://newbedfordlight.org/city-clamps-down-on-sober-homes-and-lodging-houses/

also states, "Knowing that targeted zoning regulations could violate anti-discrimination laws, some residents said the city should enforce existing building codes against sober houses so strictly that the properties go out of business."

15.   The Defendants have undertaken overly strict, atypical, and crippling code enforcement techniques against sober homes within the City, including those properties owned by the Plaintiffs to this lawsuit.

16.   At the time the City undertook its campaign to close sober houses within the City, the Court of Appeals' interpretation of M.G.L. c. 40A, Section 3, was that sober homes for disabled individuals could NOT be zoned out of neighborhoods because they had to be treated as single family homes or comparative uses, whichever provided greater access to housing.  The City officials knew this – as did the neighbors – so the Defendants used the State building code, ADA access requirements, fire safety, and lodging house licensing requirements to force sober homes out of the City.

17.   The City stalled the Plaintiffs efforts and had them needlessly spend time and money seeking reasonable accommodations for licensing and zoning that the City never intended to grant or honor.

18.   The City's multi-faceted approach to attacking sober houses put severe pressure on them, causing many to close, not open, or simply limp along, *temporarily*.

**52 Ash Street**

19.   52 Ash Street is a large colonial single-family home with over 8,000 square feet of living space.  52 Ash Street is a few houses away from Mayor Jon Mitchell's home.

20.  Based upon complaints by neighbors not wanting a sober house in the neighborhood, on May 6, 2024, Building Inspector Matthew Silva gained entry into 52 Ash Street to conduct an inspection.

21.  As a result of that inspection, Matthew Silva did NOT issue written violations for Calderia, LLC to cure, instead, the City went straight to Housing Court for injunctive relief to vacate the house of its occupants.

22.  The only written notice of the May 6th violations are contained within the Compliant and Affidavit submitted to the Housing Court on or about June 7, 2024, in support of a motion for injunctive relief.  The Affidavit is not accurate in many regards. Further, it is unusual and atypical for a City, to *first* notify a property owner of building code violations via a civil complaint for injunctive relief.  G.L. c. 148A, Section 2 requires that written notice of code violations be provided to offenders within 15 days of discovery.  The requirements of said written notice are set forth in G.L. c. 148A, Section 2, which are to be issued on standardized forms per Section 4 of said chapter.  The written violation must set forth the specific offense charged.  Matthew Silva and the City have *purposely* failed to follow the requirements of G.L. c. 148A, Section 2 and 4.

23.  The City and its agents are using what appears to be typical code enforcement in Housing Court to pressure the closure of sober homes within the City, which is driven by improper purpose and motive.

24.  The City and its agents were not fair in how they handled the inspection of and in issuing code violations for 52 Ash Street – because written violations were not issued in the days following the May 6th inspection with the typical "30 days" to correct, as the City did

not want to give Calderia, LLC any time to correct code violations in advance of the injunction hearing where the City sought to vacate the property.

25.   The City, through Matthew Silva, hit Calderia, LLC with every code issue possible – things that would not typically be cited.

26.   The City, through Matthew Silva, cited Calderia, LLC with a laundry list of issues that could not easily be satisfied, including ADA access requirements, the need to install a sprinkler/alarm system, and building code violations.

27.   One of the issues cited by Matthew Silva was a bulge on the side of the house. The City, through Matthew Silva required that the bulge be opened up.  This was done by a licensed professional who discovered evidence of prior water damage, that was not an active water leak.  Instead of allowing repair and re-covering of the opened siding, Matthew Silva ballooned the problem, asserting that the now exposed, pre-existing outdated but functioning wiring, had to not only be repaired in the location of the bulge, but throughout the entire house.  This evolved into a $50,000+ electrical re-wiring project.

28.   The State Building Code provides a certain level of discretion to City inspectors, which if used in an inequitable manner, can result in discriminatory enforcement, which the Defendants took advantage of in interfering with the Plaintiffs' sober home operations.

29.   The City, through Matthew Silva, used ADA accessibility requirements, sprinklers/alarm, code violations, and the replacement of the entire electrical wiring in this 8,000+ square foot home as a way to financially cripple Calderia, LLC.  This, along with pending Housing Court proceedings made it financially impossible for Calderia, LLC to fight to maintain and/or open the house for sober housing.

30.  Ultimately, the Defendants actions caused Calderia, LLC to sell 52 Ash Street to Vanderburgh Foundation Ash Street Realty Trust in an attempt to obtain refinancing to fund the work the Defendants were requiring at 52 Ash Street as a means to stop the home from opening as a sober house.

**Calderia, LLC/52 Ash Street's Attempts to Obtain a Reasonable Accommodation**

31.  During early 2024, Calderia, LLC submitted a request for a reasonable accommodation to the City on its required paperwork.

32.  On or about May 2, 2024, Calderia, LLC provided additional information and again requested a reasonable accommodation from the City to allow up to 15 unrelated disabled individuals to live at 52 Ash Street on the same terms and conditions available to families.

33.  The City did not approve the reasonable accommodation requested by Calderia, LLC on May 2, 2024.  Instead, on June 6, 2024, the City sent a notice to Calderia, LLC stating that a lodging house license (a/k/a rooming house license) was required for 52 Ash Street.

34.  The zoning of 52 Ash Street does not allow for lodging/rooming houses.

35.  Although the City has a "form" for parties to seek a reasonable accommodation from licensing requirements, the City took the position with Calderia, LLC that it does not grant reasonable accommodations as to licensing of lodging/rooming houses, except to waive a $25 fee.  Further, the City does not grant lodging/rooming house licenses if the zoning does not allow for such uses.

36.  The City does not have an actual process or means for sober houses to seek a reasonable accommodation from lodging/rooming house licensing requirements, only forms to complete and submit as a procedural hurdle.

37.  On June 14, 2024, Calderia, LLC's counsel submitted *another* request for a reasonable accommodation for 52 Ash Street to the City's attorney, seeking:

> *My client seeks a reasonable accommodation under the ADA and FHA to allow up to 5 unrelated individuals reside at the property, as long as the building code violations cited in the complaint are cured within 30 days. The accommodation requested extends to the architectural access violations cited in the complaint. To the extent an administrative appeal or relief is required to obtain said reasonable accommodation, please let me know.*

38.  The City's response to the June 14, 2024 letter was that a hearing would be required in Housing Court [as the City was not agreeing to any accommodation].

39.  The City does not make the forms it requires to seek a reasonable accommodation publicly known.  However, if the "forms" are not used or completed, the City will not acknowledge or grant a reasonable accommodation.  When the forms are used to seek a reasonable accommodation, the City has taken the position that the Commissioner of Inspectional Services (to whom the forms are to be sent) does not have the authority to grant a reasonable accommodation. The City uses forms and administrative process to delay and frustrate attempts to obtain a reasonable accommodation.

40.  On March 28, 2025, the Supreme Court of Massachusetts changed how G.L. c. 40A, Section 3 should be interpreted.  The City jumped on this change and invoked zoning as another reason that 52 Ash Street could not operate as a sober house.

41.  On July 3, 2025, Danny Romanowicz sent a letter to Vanderburgh Foundation Ash Street Realty Trust asserting it was illegally operating a lodging house, even though the property (52 Ash Street) was empty.

42.  On July 21, 2025, counsel to Vanderburgh Foundation Ash Street Realty Trust responded to the July 3rd letter indicating the property was empty, *which the City knew*, and therefore not being operated as a lodging house.

43.  The City of New Bedford and Danny Romanowicz have undertaken numerous actions and efforts, although many facially legal, with discriminatory purpose, to interfere with, frustrate, and stop sober housing in the City, including the sober housing intended by the Plaintiffs hereto.

44.  The City of New Bedford, Matthew Silva, and Danny Romanowicz have used process and procedure to frustrate requests for reasonable accommodation under Federal Law and to deny same.

45.  The City of New Bedford, Matthew Silva and/or Danny Romanowicz wrongfully denied the requests for a reasonable accommodation made by Calderia, LLC.

**7 Plymouth Street**

46.  On April 11, 2024, Ceazer Damante ("Damante") purchased 7 Plymouth Street, New Bedford, MA ("7 Plymouth").

47.  Damante purchased 7 Plymouth with the intention to operate 7 Plymouth as a sober home certified by the Massachusetts Alliance for Sober Housing ("MASH").

48. When the City learned that 7 Plymouth was going to open as a sober house, it undertook inspections and code enforcement actions to stop Damante from opening the sober house.

49. During the summer of 2024, the City did enter and inspect 7 Plymouth Street and did find code violations. In addition to finding code violations (mainly doing some interior work without a permit), the City issued violations to Damante for failure to obtain a legal change of use, not having a sprinkler system, and not complying with ADA access requirements.

50. Since those inspections, Damante has spent thousands of dollars and countless hours working with contractors, counsel, and the Court system to cure the code violations. Although Damante has done everything right to correct the code violations, the City has purposely dragged out the process by not timely issuing permits, ignoring or not responding to requests for inspections or inspecting completed work, and otherwise making the process time consuming and unending. The City has done this to prevent the intended use as a sober house.

51. On July 31, 2024, upon the City's application, the Housing Court, *inter alia*, reduced the occupancy of 7 Plymouth Street to 3 individuals until a change of use was obtained, indicating that after a change in use was obtained the occupancy could be increased to 5, and also that the occupancy would be limited to 5 until sprinklers were installed. The Housing Court also indicated that a reasonable accommodation could be requested under the ADA.

52.  On November 9, 2024, a reasonable accommodation was requested via email and certified mail directed to Commissioner Danny Romanowicz, as required by the City's rules.  No one from the City responded to the request and by operation of the City's rules, the reasonable accommodation was granted to Damante.

This reasonable accommodation was as follows:

"This is a request for a reasonable accommodation to allow five (5) unrelated disabled individuals to live at the Property with all the same rights and privileges as a "family," occupying a single-family home, under the City of New Bedford zoning ordinance and the State Building Code.  Consistent with this request, my client seeks relief from any requirement to seek a change in use under state or local laws (i.e. obtaining a certificate of occupancy for something other than a single-family home) and from being categorized as a lodging house or boarding house."

53.  The change in use issue was resolved by the City's granting of the reasonable accommodation (be default).  With such, Damante moved forward with installing sprinklers and an alarm system.  The system was ultimately installed and approved by the City after an extended and drawn out inspection and approval process.

54.  On October 3, 2025, Danny Romanowicz unilaterally withdrew the reasonable accommodation granted to Damante. Damante did not accept the rescission of the reasonable accommodation that was obtained in accordance with the City's rules and relied upon by him to continue to invest time and money into 7 Plymouth Street.

55.  The City then took the position that Danny Romanowicz, the Commissioner of Inspectional Services, did not have the authority to grant the reasonable accommodation. The City's current position is that the reasonable accommodation granted to Damante has been rescinded and therefore is denied or of no legal effect.  The City's actions in this regard are intentional, unfair and deceptive.

56.  The City has forms for parties to use to seek reasonable accommodations from the Commissioner of the Inspectional Services, but simply uses the forms as a delay tactic and hurdle for individuals, as the City does not honor the rules and procedures that it dictates.

57.  On or about December 9, 2025, Danny Romanowicz took the position that 7 Plymouth Street was a lodging house.  The December 9th letter threatened to "commence zoning enforcement against the use utilizing all available means."  The December 9th letter was sent to intimidate, coerce and deter Damante from continuing his efforts to open 7 Plymouth Street as a sober home.

58.  When Damante started the process of opening a sober house at 7 Plymouth Street, the law required the City to allow the use under its zoning.  In March 2025, the interpretation of G.L. c. 40A, Section 3, para. 4 changed, empowering the City to use zoning as additional leverage to force 7 Plymouth Street to close as a sober house.  In short, the City recognized this change in the law and is using zoning as another way to prevent the occupancy of 7 Plymouth Street as a sober house.

59.  The Defendants are ignoring that the change in the law as to zoning makes Damante's use a prior non-conforming use, that may continue.

60.  Damante hired contractors and corrected the code violations, installed a sprinkler and alarm system, and obtained a variance from the Architectural Access Board for the ADA access requirements.  Damante obtained a reasonable accommodation for the use as a sober house (change in use).  Irrespective of Damante jumping through all the City's hoops, the City, Matthew Silva, and Danny Romanowicz still will not allow the use.

61.  The City is presently seeking an order from the Housing Court to reduce the occupancy to zero, as the City will not allow a single person in recovery to live at 7 Plymouth Street.

62.  A limited number of unrelated individuals who are not in recovery may live at 7 Plymouth Street but the Defendants will not allow a single person in recovery to live at the property.

**103 Caroline Street**

63.  On January 31, 2024, Newlife, LLC ("Newlife") purchased 103 Caroline Street, New Bedford, MA.

64.  Newlife purchased 103 Caroline Street with the intention to lease the property for use as a sober home.

65. Newlife then engaged an architect to ensure code compliance to open the property as a sober house.

66.  Newlife made it known to the City during the process of seeking permits to renovate the property that it would be used as a sober house.

67.  Upon learning that 103 Caroline Street was to be used as a sober house, the City took the position that the Architectural Access Board had to approve ADA accessibility requirements.  This stopped the renovations from moving forward while a determination was made as to ADA accessibility requirements.

68.  From about April 2024 through August 2024, Newlife, directly and through the architectural firm it hired to draft plans and obtain permits for the renovation of 103

Caroline Street was frustrated and delayed by the City's changing and unclear requirements to proceed with the renovation work.

69. On August 7, 2024, the City sent a letter to Newlife indicating that the *empty* property known as 103 Caroline Street was a "lodging house" and that a license must be obtained or Newlife could be subjected to criminal prosecution, jail time and daily fines.

70. The City sent the August 7, 2024 letter to intimidate, coerce and deter Newlife from continuing its efforts to open 103 Caroline Street as a sober home.

71. On September 9, 2024, Newlife sought a reasonable accommodation from the City using its process and form, to occupy 103 Caroline Street as a sober house, seeking: "*The reasonable accommodation requested is to provide access to housing for disabled individuals in recovery from substance use, given this use is not allowed anywhere within the City. The accommodation is relief from the City's zoning (Appendix A) that does not recognize Congregate Living Facilities anywhere in the City, relief from parking requirements (Appendix C - none are specific to this use), and relief from local licensing requirements as a lodging house (a lodging house is not the intended use)."*

72. The City did not grant the reasonable accommodation requested by letter dated September 9, 2024.

73. On September 10, 2024 at 1:02PM, Newlife, through counsel, *on forms made available by the City's licensing board,* sought a reasonable accommodation from the lodging house requirements, imposed by the August 7, 2024 letter.

74. Although the City's licensing board has forms to seek a "reasonable accommodation," the process is a ruse.

75. After wasting time and money completing and submitting the City licensing board's form for a "reasonable accommodation," the City stated on September 10, 2024 at 3:52PM: "This application will be heard at the next Board Meeting, the only accommodation that the Licensing Board can grant is waiving of the $25.00 application fee for hardship cases."

76. Newlife also made a public records request to the City's licensing board on September 10, 2024 to understand the internal communications that were leading to the lodging house licensing notices. The City responded that it needed more time to respond, then simply ignored the public records request.

77. The City has forms and a process for parties to seek a reasonable accommodation from lodging house licensing requirements, *but for sober houses*, the City refused to even consider providing a reasonable accommodation (other than waiving a $25 fee), therefore denying same as a matter of course without any consideration.

78. Counsel to Newlife attended a hearing before the City's licensing board and pressed for a reasonable accommodation for 60 Hathaway Street and was told by the licensing board that it had no ability to grant a reasonable accommodation, again, even though forms existed, that were completed and provided by the City, to seek a reasonable accommodation from the licensing board.

79. The City does not allow sober housing in any zone within the City. Given the inability to obtain permitting to renovate 103 Caroline Street, having suffered substantial delays, misdirection, and roadblocks by the City, and having been denied a reasonable accommodation from the City (and its licensing board) to legally operate 103 Caroline

16

Street as a sober home, Newlife determined that is would be financially prudent to sell the property, instead of continuing to attempt to open a sober home.

80.  The City and Danny Romanowicz's conduct was intentional and purposeful to prevent 103 Caroline Street from opening as a sober house.  Further, Newlife lost a lessee for 103 Caroline Street as a result of the wrongful conduct of the City and Danny Romanowicz.

**479 County Street**

81.  Newlife purchased 479 County Street, New Bedford, MA on March 29, 2024.

82.  Newlife intended to renovate 479 County Street and lease it as a sober house for individuals in recovery from substance use.

83.  At the time 479 County Street was purchased, the City could not use zoning or local laws to stop the operation of a sober house at 479 Country Street based upon the occupants being unrelated individuals because those prospective occupants were disabled and protected under G.L. c. 40A, Section 3.

84.  Knowing that G.L. c. 40A, Section 3 protected the intended use as a sober recovery home for disabled individuals, the City utilized State Law and atypical interpretation and application of the State Building Code, including refusing to approve or comment on submissions made to obtain a building permit for the renovation of 479 County Street.

85.  On May 24, 2024, the City, through Danny Romanowicz, denied an application for a building permit for 479 County Street indicating that a special permit was required

from the ZBA.  This was done to delay issuance of the building permit as Danny Romanowicz knew no special permit would issue.

86.  An appeal was taken to the ZBA based upon the state of the law at that time which allowed 479 County Street to open as a sober house a/k/a congregate housing for the disabled as a matter of right.  The ZBA denied relief and intentionally delayed Newlife's ability to obtain a building permit by asserting a technical argument that on the submission to the City, the prospective use was identified as a "group home" and not a "sober house," although Newlife's architect was instructed by Danny Romanowicz to identify the new use as a "group home," after Danny Romanowicz was fully informed as to the intended use as a sober home.[5]

87.  On or about September 5, 2024, Newlife submitted a second building permit application for 479 County Street, changing the intended use to "Congregate Living Facility for disabled individuals," and simultaneously sought a reasonable accommodation for said use.

88.  The reasonable accommodation requested by Newlife for 479 County Street was, inter alia, "*The reasonable accommodation requested is to provide access to housing for disabled individuals in recovery from substance use, given this use is not allowed anywhere within the City. The accommodation is relief from the City's zoning (Appendix A) that does not recognize Congregate Living Facilities anywhere in the City, relief from parking requirements (Appendix C - none are specific to this use), and relief from local licensing requirements as a lodging house (a lodging house is not the intended use).*

---

[5] The City does not include "sober homes" in its zoning, so Newlife's architect sought an interpretation from the City's Commissioner of Inspectional Services.

89.  On October 19, 2024, the City, through Danny Romanowicz, wrongfully denied the request for a reasonable accommodation as to 479 County Street.  The City did not engage in an interactive process to address the requested accommodation, but instead simply put up roadblocks and requested information not relevant or necessary for the determination.

90.  On October 21, 2024, Newlife's counsel responded to Danny Romanowicz's October 19, 2024 denial letter, providing additional information, and sought reconsideration of the requested accommodation.

91.  On November 9, 2024, a follow up inquiry was made with Danny Romanowicz as to the requested reasonable accommodation.  Neither Danny Romanowicz, nor the City, responded to that follow up inquiry.  No reconsideration was given or interactive process entered into by the City or Danny Romanowicz with respect to the requested reasonable accommodation for 479 County Street.

92.  On October 29, 2024, an estimate of construction costs was provided by Newlife's architect to Danny Romanowicz, as that was one of the items cited in the October 19, 2024 letter as a basis to deny the requested reasonable accommodation.

93.  Newlife's architect was diligent in attempting to discuss and meet with the City, particularly Danny Romanowicz and Matthew Silva, to resolve the alleged issues holding up the building permit for 479 County Road, but he was not received or engaged by the City to achieve a resolution.  Newlife's architect found the City's handling of this matter to be unusual in his experience.

94.  From October 29, 2024 through January 31, 2025, Newlife's architect made many inquiries with the City/Danny Romanowicz/Matthew Silva to find out what was holding up the building permit, but he received no information or responses from them.

95.  The City and Danny Romanowicz purposefully caused excessive delay, through misdirection, requests for more information, throwing up roadblocks, and not responding to inquiries, causing financial harm and delay to Newlife and its intended sober home project.

96.  The City never issued a building permit for 479 County Street, nor did the City or Danny Romanowicz ever respond to Attorney Tine's October 21, 2024 letter following up on the requested reasonable accommodation.

97.  The City and Danny Romanowicz intentionally delayed and interfered with Newlife's attempts to develop 479 County Street as a sober house, to the point where Newlife had no choice but to abandon the idea and turn to alternative uses for the property.

98. As a result of the Defendants' intentionally wrongful conduct and refusal to grant a reasonable accommodation, Newlife lost a lessee that it had contracted with to rent 479 County Street, causing harm and damages to Newlife.

99.  The City has a pattern or practice of using laws and/or process to burden, interfere with, and prevent the use of homes within the City to provide housing to individuals in recovery from substance use, including but not limited to the addresses identified *supra*, and 110 Hawthorne Street, 60 Hathaway Street, 60 Thomas Street, 545 Rivet Street, 6 Sears Street, and 12 Sears Street.

**COUNT I: VIOLATION OF THE FAIR HOUSING ACT, 42 U.S.C. § 3601, *et seq*.**

100. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

101. "Congress explicitly intended for the FHAA to apply to zoning ordinances and other laws that would restrict the placement of group homes." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002)(citing H.R. Rep. No. 100-711, at 24 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2185)(stating that amendments to the FHA include protections against disability discrimination "also apply to state of local land use or health and safety laws, regulations, practices, or decisions which discriminate against individuals with handicaps").

102. The FHA prohibits at least three types of discrimination. First, it "prohibits intentional discrimination – that is, disparate treatment." *Avenue 6E Investments, LLC v. City of Yuma, Ariz*. (9th Cir. 2016) 818 F.3d 493, 502 ("Avenue 6E"). A government cannot "zone land or refuse to zone land out of concern that minorities [such as people with disabilities] would enter a neighborhood." *Id*. Second, the FHA prohibits "disparate impact" discrimination — that is, "actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason." *Avenue 6E, at 503, citing Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2522. A disparate impact claim "'permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification'" and target "'artificial, arbitrary, and unnecessary barriers' to minority housing and integration that can occur through unthinking, even if not malignant,

policies of developers and governmental entities." *Id*. (quoting *Texas Dep't of Hous. & Cmty. Affairs*, 135 S.Ct. at 2522).  Finally, FHA discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

103.  The FHAA makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of the FHAA. 42 U.S.C. § 3617.

104.  Substance use disorder is a physical or mental impairment which substantially limits one or more of such person's major life activities and thus, is defined as a "handicap" or disability under 42 U.S.C. § 3602(h) for people in recovery. Plaintiffs' actual and potential residents of their group recovery home are recovering from mental health issues, and therefore, are members of a protected class. The Defendants knew the residents of Plaintiffs' sober homes were or would be persons with disabilities.

105.  Plaintiffs are "aggrieved person[s]" as defined in the FHA. 42 U.S.C. § 3602(d) & (i); *Pac. Shores, supra*, 730 F.3d at 1157, n. 16.

106.  By excluding Plaintiffs sober housing from the City in order to satisfy their own and/or the community's discriminatory intent, the City, Matthew Silva, and Danny Romanowicz have unlawfully made unavailable or denied a dwelling to Plaintiffs' actual

and/pr potential residents on the basis of disability. Defendants' actions are in violation of the Fair Housing Act, 42 U.S.C. §§ 3604(a) and (f) and its implementing regulations.

107.  Defendants are discriminating against Plaintiffs' actual and potential residents in violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, by denying and otherwise making residency unavailable to them because of their handicaps.

108.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by applying the Building Code, Zoning Ordinance, ADA accessibility requirements, and licensing requirements in an arbitrary and capricious manner and thereby denying Plaintiffs' actual and potential residents the ability to live in their choice of residence within the boundaries of the City.

110.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by discriminating against Plaintiffs' actual and potential residents because of their handicaps in the terms, conditions, and privileges of residing at sober recovery homes provided by the Plaintiffs.

111.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, including but not limited to 42 U.S.C. § 3617, by employing its local laws, the threat of civil penalties and fines, zoning, and building codes to intimidate, coerce, segregate and reject Plaintiffs' potential residents and those facilities that serve them because of their handicaps.

112.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by providing its municipal code enforcement services differently to Plaintiffs and their potential residents and those facilities that serve them because of their handicaps.

113.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. because under the FHA, a governing entity such as the City may not facially single out handicapped persons and apply different rules to them.

114.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by restricting and attempting to restrict Plaintiffs' potential residents, because of their handicaps, as to their choice to reside at a sober home within the City.

115.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by coercing, intimidating, threatening, and interfering with Plaintiffs because of the handicaps of Plaintiffs' potential residents, in the exercise and enjoyment of their right to reside at a sober recovery home of their choice.

116.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by failing to make reasonable accommodations in the application of its zoning and other codes so as to afford Plaintiffs' actual and potential residents, an equal opportunity to use and enjoy a safe, affordable, sober living environment, to promote their recovery from substance use.

117.  The Defendants' conduct as set forth above injured Plaintiffs by committing discriminatory housing practices and failing to grant Plaintiffs' request(s) for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability and perpetuating segregation in violation of the FHA. 42 U.S.C. § 3601 *et seq*.

118.  The Defendants' conduct was intentional, willful, with malice and/or made in disregard of the rights of others. At a minimum, the City acted with deliberate indifference to the rights of Plaintiffs and their potential residents.

**COUNT II: TITLE II OF THE AMERICANS WITH  DISABILITIES ACT, 42 U.S.C. §§12131, *et***

***seq.***

119.  Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

120.  Title II of the Americans with Disabilities Act ("ADA") "provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1157 (9th Cir. 2013) ("*Pac. Shores*"), quoting 42 U.S.C. § 12132.

121.  The ADA "prohibits governmental entities from discriminating against disabled persons through zoning." *Pac. Shores*, *supra*, 730 F.3d at 1157.

122.  Like the FHA, the ADA prohibits at least three types of discrimination — disparate treatment, disparate impact, and failure to accommodate. 42 U.S.C. § 12132; 28 C.F.R. § 35.130; *see, e.g.*, *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004).

123.  The City is a "public entity" as defined in Title II of the ADA. 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

124.  Plaintiffs' potential and actual residents are "qualified individuals with a disability" as defined in Title II of the ADA, and therefore, are members of a protected class. 42 U.S.C. § 12131; 28 C.F.R. § 35.104; 28 C.F.R. § 35.108.

125.  The ADA provides Plaintiffs with a cause of action, even though it is not itself an individual with a disability. *Pac. Shores, supra*, 730 F.3d 1142, 1157, n. 17 (citing *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir.2002)); 42 U.S.C. § 12133.

126.  The Defendants are violating the rights of Plaintiffs and their actual and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by discriminating against them and the facilities that desire to serve them, denying and otherwise making residency at the Plaintiffs' sober houses unavailable to them because of their handicaps.

127.  The Defendants are violating the rights of Plaintiffs and their potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by applying the Code in an arbitrary and capricious manner and thereby denying them their choice of residing in a safe, drug free, structured living environment within the boundaries of the City.

128.  The Defendants are violating the rights of Plaintiffs and their actual and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq., by discriminating against them because of their handicaps in the terms, conditions, and privileges of residing at the home of their choice and receiving the provision of peer support services by Plaintiffs.

129.  The Defendants are violating the rights of Plaintiffs and their actual and potential residents, rights under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by employing its zoning, life safety and building codes to segregate and reject them because of the social stigma of their handicaps.

130.  The Defendants are violating the rights of Plaintiffs and their actual and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by utilizing licensing and permit requirements to provide municipal code enforcement services that is not equal to groups of related nondisabled persons and other groups of unrelated disabled persons.

131.  The Defendants are violating the rights of Plaintiffs and their actual and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by utilizing licensing and permit requirements to provide municipal code enforcement services that is not as effective in affording equal opportunity to obtain the same benefit, as groups of related nondisabled persons and other groups of unrelated disabled persons.

132.  The Defendants are violating the rights of Plaintiffs and their actual and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by providing its municipal code enforcement services differently to them and the facilities that provide group homes and treatment to them because of the social stigma associated with their handicaps.

133.  The Defendants are violating the rights of Plaintiffs and their actual and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by utilizing licensing and permit requirements, a requirement not imposed upon other groups of related nondisabled persons, to deny Plaintiffs' potential and actual residents because of the handicap of the residents the same enjoyment of any rights, privilege, advantage, or opportunity enjoyed by nondisabled persons.

134.  The Defendants' conduct as set forth above injured Plaintiffs by committing discriminatory zoning practices and failing to grant Plaintiffs' request for reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of Title II of the ADA. 42 U.S.C. § 3601 *et seq*.

135.  The Defendants' conduct was intentional, willful, with malice, and/or made in disregard of the rights of others. At a minimum, the City acted with deliberate indifference to the rights of Plaintiffs and their existing and potential residents.

**COUNT III: VIOLATION OF PLAINTIFFS' CIVIL RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION, 42 U.S.C. SECTION 1983**

136.  Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

137. The Fourteenth Amendment to the United States Constitution's Equal Protection Clause prohibits a State from "deny[ing] any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

138.  A government violates the Equal Protection Clause if it "zone[s] land or refuse[s] to zone land out of concern that minorities would enter a neighborhood." *Ave. 6E Investments, LLC v. City of Yuma*, Ariz., 818 F.3d 493, 502 (9th Cir. 2016) ("Avenue 6E").

139.  "When there is a proof that a discriminatory purpose has been a motivating factor in [a] decision, . . . judicial deference is no longer justified." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) ("Arlington Heights").

140.  The City, acting under color of state law, is violating the civil rights of disabled persons under 42 U.S.C. Section 1983 by utilizing its Code and its method of administering

its zoning codes with the purpose of subjecting Plaintiffs and their actual and potential

residents to discrimination solely on the basis of their handicaps which are viewed by the

City, its leaders, and many of its residents as socially unacceptable or stigmatized.

141. The Defendants, acting under color of state law, are violating Plaintiffs and their

potential residents' civil rights under 42 U.S.C. Section 1983 by subjecting them solely on

the basis of their potential residents' handicaps, to discrimination under its code

enforcement activities.

142.  The Defendants, acting under color of state law, are violating Plaintiffs'

potential residents' civil rights under 42 U.S.C. Section 1983 by denying the equal

protection of the law guaranteed by the Fourteenth Amendment to the United States

Constitution by applying the City's code enforcement activities in a manner so as to

arbitrarily and irrationally deny them, because of their handicaps the residential

opportunities afforded to both groups of related nondisabled persons and unrelated

disabled persons.

143.  The Defendants' conduct as set forth above injured Plaintiffs by committing

unconstitutional and discriminatory zoning practices and failing to grant Plaintiffs' request

for a reasonable accommodation with the purpose or effect of discriminating on the basis

of disability in violation of 42 U.S.C. § 1983 and the Equal Protection Clause.

144.  Plaintiffs have been injured by the Defendants' discriminatory and

unconstitutional conduct and have suffered damages as a result.

145.  The Defendants' conduct was intentional, willful, with malice, and/or made in disregard of the rights of others. At a minimum, the City acted with deliberate indifference to the rights of Plaintiffs and their potential residents.

**COUNT IV: DEPRIVATION OF PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, 42 U.S.C. SECTION 1983**

146.  Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

147.  The Fourteenth Amendment to the United State Constitution's due process clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

148.  "Constitutional scrutiny of zoning regulations is heightened . . . when the regulations infringe on a fundamental interest or discriminate against a suspect class." *J.W. v. City of Tacoma, Wash*., 720 F.2d 1126, 1128 (9th Cir.1983).

149.  The United States Supreme Court "'has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment'" and "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 499, 97 S. Ct. 1932, 1935 (1977)(quoting *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639-640 (1974)).

150.  A zoning decision must also be set aside if it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Village of Euclid v. Ambler Realty Co*., 272 U.S. 365, 395 (1926).

151.  The Defendants' decisions to deny Plaintiffs' request for reasonable accommodation were not related to any substantial zoning interest.

152.  The Defendants' conduct as set forth above injured Plaintiffs by committing unconstitutional and discriminatory zoning practices and failing to grant Plaintiffs' request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of 42 U.S.C. § 1983 and the Due Process Clause.

153.  Plaintiffs have been injured by the Defendants' discriminatory and unconstitutional conduct and have suffered damages as a result.

154.  The Defendants' conduct was intentional, willful, and made in disregard of the rights of others. At a minimum, the Defendants' acted with deliberate indifference to the rights of Plaintiffs and their existing and potential residents.

**COUNT V: G.L. c. 151B and G.L. c. 40A, Section 3**

155.  Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

156.  G.L. c. 151B, s. 4 makes it unlawful "[f]or any person to directly or indirectly induce, attempt to induce, prevent, or attempt to prevent the sale, purchase, or rental of any  dwelling or dwellings by: (a) implicit or explicit representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular age, race, color, religion, sex, gender identity, national or ethnic origin, or economic level or a

handicapped person, or a person having a child, or implicit or explicit representations regarding the effects or consequences of any such entry or prospective entry…"

157.   All political subdivisions of the Commonwealth are "persons" for the purposes of Chapter 151B.  See Section 1.

158.   G.L. c. 151B, s. 1 defines the term ''handicap'' to mean "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment, but such term shall not include current, illegal use of a controlled substance as defined in section one of chapter ninety-four C."

159.   The Defendants violated Plaintiffs' rights and violated Chapter 151B by denying it relief in contravention of Chapter 40A and the local Zoning By-law, and G.L. c. 40A, s. 3.

160.   The Defendants have exercised their powers to regulate land use in a way that discriminates against disabled persons without justification or cause by preventing legal occupancy of the Plaintiffs' properties that is reasonable and necessary.

161.   The Defendants' conduct was arbitrary, capricious, unreasonable, malicious and in bad faith, and shocks the conscience.

162.   The Defendants' wrongful actions prevented the Plaintiffs from providing access to the disabled of much needed housing, an action that is discriminatory on its face against persons with disabilities, a discrete and insular minority that faces restrictions and limitations and has been subjected to a history of purposeful unequal treatment.

163.  G.L. c. 40A, Section 3 requires for purposes of local laws that the Defendants allow congregate housing for the disabled on the same terms and conditions provided to others.

164.  The Defendants violation of G.L. c. 40A, Section 3 constitutes discrimination and therefore is a violation of G.L. c. 151B.

165.  Because of the Defendants' denial of Plaintiffs' requests for reasonable accommodation, Plaintiffs have expended significant time and financial resources, have lost the opportunity to timely conduct their business and provide a much-needed service, and are incurring substantial damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court awards the following relief:

1.  Declare that the Defendants acted unlawfully under the Fair Housing Act, the Americans with Disabilities Act, G.L. c. 151B, G.L. c. 40A, and other federal and state laws as alleged herein;

2.  Declare that the Defendants administration, application, and enforcement of its zoning regulations violates the rights of Plaintiffs and their actual and potential residents, under the Fair Housing Act, the Americans with Disabilities Act, Fourteenth Amendment, and other federal and state laws alleged herein;

3.  Declare that the Defendants have illegally discriminated against Plaintiffs by arbitrarily and capriciously applying State Laws, local laws, and zoning codes against them, by interfering with the Plaintiffs' potential residents' equal opportunity to use and enjoy a dwelling, in violation of the Federal Fair Housing Act;

4.  Declare that the Plaintiffs' use of the subject properties as sober recovery homes for handicapped persons to be a lawful nonconforming use or prior nonconforming use in conformance with the zoning of the City of New Bedford;

5.  Enter a temporary restraining order, preliminary and permanent injunction enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any one of them from enforcing unlawful or discriminatory zoning regulations, and from taking actions that either directly or indirectly interfere in any way with Plaintiffs' abilities to provide housing in a group residential setting to groups of unrelated, disabled persons who are in recovery;

6.  Enter a temporary restraining order and a preliminary and permanent injunction enjoining the Defendant from taking actions either directly or indirectly which would interfere in any way with Plaintiffs opening and operating the sober recovery homes as the addressed identified in this complaint pursuant to 42 U.S.C. §3613;

7.  Enter a temporary restraining order and a preliminary and permanent injunction enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them from interfering with the operation of Plaintiffs of group recovery homes for disabled persons and interfering in any way with the right of the Plaintiffs' potential residents to reside in the properties identified in this complaint pursuant to 42 U.S.C.A. § 3613;

8.  Award compensatory damages, including business destruction and/or losses, damages for direct, indirect and emotional harm, pain and suffering, to be determined at trial but in no event less than FIVE MILLION DOLLARS ($5,000,000.00);

9.  Award punitive damages to be determined at trial but in no event less than TWO

MILLION DOLLARS ($2,000,000.00);

10.  Grant an award of reasonable costs and attorneys' fees; and

11.  Order such other relief as this Court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated this 29th day of December 2025.

For the Plaintiffs,

*/s/Andrew J. Tine* (BBO633639)
Law Office of Andrew J. Tine
18 Maple Avenue, Suite 267
Barrington, RI 02806
atine@tinelaw.com
tel. 401-396-9002